FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO
26 OCT 14 PM 1:16

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. ______________________
*(To be supplied by the court)*

**JANE DOE, Pro Se,**

**Jury Trial requested:**
**(please check one) _X_ Yes ___ No**

Plaintiff,

v.

**see attached**

Defendant(s).

*(List each named defendant on a separate line. If you cannot fit the names of all defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names of the defendants listed in the above caption must be identical to those contained in Section B. Do not include addresses here.)*

---

## COMPLAINT

---

**NOTICE**

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

**Plaintiff need not send exhibits, affidavits, grievances, witness statements, or any other materials to the Clerk's Office with this complaint.**

**FULL LIST OF DEFENDANTS**

1. TELLER COUNTY BOARD OF COUNTY COMMISSIONERS (as an indemnification party)

2. JASON MIKESELL, Sheriff of Teller County, in his official and individual capacities

3. DEPUTY JESSE WEATHERILL, in his individual capacity

4. DEPUTY KYLE PERKINS, in his individual capacity

5. DEPUTY SANTIAGO MARQUEZ, in his individual capacity

6. UC HEALTH PIKES PEAK REGIONAL HOSPITAL (doing business as UC Health Woodland Park)

7. KATIE (ER Charge Nurse), in her individual capacity

8. JANE DOE (ER Nurse), in her individual capacity

9. RYAN DOE (Security Guard), in his individual capacity

10. JANE DOE (Security Guard), in her individual capacity

## A. PLAINTIFF INFORMATION

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address. Failure to keep a current address on file with the court may result in dismissal of your case.*

Jane Doe, Pro Se

*(Name and complete mailing address — Redacted)*

*(Telephone number and e-mail address — Redacted)*

## B. DEFENDANT(S) INFORMATION

*Please list the following information for each defendant listed in the caption of the complaint. If more space is needed, use extra paper to provide the information requested. The additional pages regarding defendants should be labeled "B. DEFENDANT(S) INFORMATION."*

**Defendant 1:**

TELLER COUNTY BOARD OF COUNTY COMMISSIONERS (as an indemnification party)

Teller County Board of County Commissioners, 112 North A Street, Centennial Building, Cripple Creek, CO 80813

**Defendant 2:**

JASON MIKESELL, Sheriff of Teller County, in his official and individual capacities

c/o Teller County Sheriff's Office, 11400 Highway 24, Divide, CO 80814

**Defendant 3:**

DEPUTY JESSE WEATHERILL, in his individual capacity

c/o Teller County Sheriff's Office, 11400 Highway 24, Divide, CO 80814

**Defendant 4:**

DEPUTY KYLE PERKINS, in his individual capacity

c/o Teller County Sheriff's Office, 11400 Highway 24, Divide, CO 80814

**SEE ATTACHED — ADDITIONAL PAPER ATTACHED**

## B. DEFENDANT(S) INFORMATION (continued)

**Defendant 5:**

DEPUTY SANTIAGO MARQUEZ, in his individual capacity

c/o Teller County Sheriff's Office, 11400 Highway 24, Divide, CO 80814

**Defendant 6:**

UC HEALTH PIKES PEAK REGIONAL HOSPITAL (doing business as UC Health Woodland Park)

16420 West U.S. Highway 24, Woodland Park, CO 80863

**Defendant 7:**

KATIE (ER Charge Nurse), in her individual capacity

c/o UC Health Pikes Peak Regional Hospital, 16420 West U.S. Highway 24, Woodland Park, CO 80863

**Defendant 8:**

JANE DOE (ER Nurse), in her individual capacity

c/o UC Health Pikes Peak Regional Hospital, 16420 West U.S. Highway 24, Woodland Park, CO 80863

**Defendant 9:**

RYAN DOE (Security Guard), in his individual capacity

c/o UC Health Pikes Peak Regional Hospital, 16420 West U.S. Highway 24, Woodland Park, CO 80863

**Defendant 10:**

JANE DOE (Security Guard), in her individual capacity

c/o UC Health Pikes Peak Regional Hospital, 16420 West U.S. Highway 24, Woodland Park, CO 80863

## C. JURISDICTION

*Identify the statutory authority that allows the court to consider your claim(s): (check one)*

_X_ Federal question pursuant to 28 U.S.C. § 1331 (claims arising under the Constitution, laws, or treaties of the United States)

*List the specific federal statute, treaty, and/or provision(s) of the United States Constitution that are at issue in this case.*

**28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1343(a)(3)-(4) (civil rights jurisdiction); 42 U.S.C. § 1983 (deprivation of constitutional rights under color of law); Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12181 et seq.; the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd; and 28 U.S.C. § 1367(a) (supplemental jurisdiction).**

___ Diversity of citizenship pursuant to 28 U.S.C. § 1332 (a matter between individual or corporate citizens of different states and the amount in controversy exceeds $75,000)

*Plaintiff is a citizen of the State of _______________.*

*If Defendant 1 is an individual, Defendant 1 is a citizen of _______________.*

*If Defendant 1 is a corporation, Defendant 1 is incorporated under the laws of _______________ (name of state or foreign nation). Defendant 1 has its principal place of business in _______________ (name of state or foreign nation).*

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

## D. STATEMENT OF CLAIM(S)

*State clearly and concisely every claim that you are asserting in this action. For each claim, specify the right that allegedly has been violated and state all facts that support your claim, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim. You do not need to cite specific legal cases to support your claim(s). If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s). Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

**CLAIM ONE:**

Supporting facts:

## I. STATEMENT OF FACTS

### The Administrative Context and Hospital Delay

7. Plaintiff is a medically retired United States Veteran with a 100% permanent and total service-connected disability rating for PTSD due to Military Sexual Trauma (MST), with an additional statutory housebound designation.

8. The medical emergency Plaintiff experienced on June 28, 2023, was directly exacerbated by systemic administrative and scheduling errors by Defendant UCHealth's staff. Plaintiff's critical diagnostic evaluation was originally ordered for April 2023. However, a UCHealth receptionist mismanaged the scheduling, setting the appointment for April 6, 2023—exactly one day after Plaintiff's Veterans Affairs (VA) medical referral expired on April 5, 2023.

9. The VA immediately issued and transmitted a renewed, valid medical referral to UCHealth on April 17, 2023. For over two months, UCHealth administrative personnel continuously and falsely maintained to Plaintiff that no such referral had been received, actively blocking Plaintiff's access to vital diagnostic tracking.

10. On the morning of June 28, 2023, prior to the scheduled 1:00 p.m. appointment, Plaintiff contacted UCHealth to verify the referral status and was again told it did not exist. Upon Plaintiff demanding to speak with a supervisor, a UCHealth clinic manager executed an internal database search and phoned Plaintiff back, explicitly admitting: *"We do have the VA referral. It was in a separate folder. The date says April 17th is when the VA sent it to us."*

11. This admission proves that UCHealth possessed actual, continuous electronic possession of Plaintiff's authorized VA care referral since April 17, 2023, and that

**SEE ATTACHED — ADDITIONAL PAPER ATTACHED**

## D. STATEMENT OF CLAIMS (continued)

their systemic administrative negligence directly delayed critical medical monitoring, causing the severe physical deficiencies and subsequent organic physiological collapse that manifested later that day.

**The Plaintiff's Medical Vulnerability and Prior Crisis**

12. For approximately three weeks leading up to June 28, 2023, Plaintiff was experiencing an escalating medical crisis, which is objectively documented by clinical logs and an emergency room visit showing continuous attempts to reach out to emergency services for medical help.

13. Medical bloodwork from this period revealed that Plaintiff was suffering from severe physical deficiencies, including acute anemia and low calcium, which triggered a severe, involuntary medical psychosis and severe physiological shock.

**The Service Dog Discrimination and First Removal**

14. On June 28, 2023, at approximately 12:45 p.m., Plaintiff was lawfully inside the medical facility and successfully attended an appointment with their primary care physician. During this initial visit, Plaintiff explicitly disclosed to the physician that Plaintiff was experiencing severe trauma and that the memories and perceptions of the distressing sequence of events were actively blending together; the treating physician explicitly recognized Plaintiff's acute vulnerability and stated, "something medical is exacerbating mental." During this same visit, Defendant Ryan Doe Security Guard questioned Plaintiff regarding their ADA task-trained service dog, and two separate hospital staff members explicitly informed Defendant Ryan Doe Security Guard that Plaintiff's response was legally sufficient and compliant.

15. Despite this confirmation, when Plaintiff returned to the clinic building around 3:10 p.m. for required medical diagnostic bloodwork, Defendant Ryan Doe Security Guard chose to override staff, seek out ER nurses, and intentionally escalate the situation. Hospital staff and Teller County Sheriff's Office (TCSO) personnel were summoned, unlawfully charged Plaintiff with criminal trespassing, and escorted Plaintiff out of the building.

**The VCL Intervention and the Second ER Confrontation**

16. Following this initial removal, Plaintiff contacted the Veterans Crisis Line (VCL) while in acute physical and physiological distress. While actively on the line with the federal crisis dispatcher, the VCL dispatcher contacted TCSO communication directly. The TCSO communication desk explicitly stated to the VCL dispatcher that Plaintiff was permitted to return to the Emergency Room (ER) side of the facility to receive necessary emergency medical treatment.

17. Plaintiff immediately returned to the ER entrance to seek stabilizing care, keeping the VCL representative active on the phone line. Upon entering the ER, Defendant Jane Doe Security Guard stated to Plaintiff, "I'm on your side," while actively staring down at her phone. Plaintiff handed their cell phone to the ER receptionist stating, "I'm a disabled veteran and I'm having a medical emergency, can you please speak to the Veteran's Crisis Line on my behalf."

18. Defendant Ryan Doe Security Guard charged into the ER, aggressively intercepted Plaintiff, and unlawfully demanded invasive, non-compliant descriptions regarding the service dog.

19. Rather than providing mandatory emergency medical screening or stabilizing care for a visible crisis, ER staff escalated the conflict and summoned TCSO personnel to the ER entrance a second time. Responding TCSO deputies physically escorted Plaintiff out of the ER door, refusing medical stabilization.

**Deputy Weatherill's Intervention and the Sexual Objectification**

20. Following this second removal from the ER side of the facility, Defendant Deputy Jesse Weatherill became actively involved. While Plaintiff was on the exterior property in a state of escalating physical distress, Defendant Deputy Weatherill began aggressively staring at Plaintiff's buttocks. Defendant Deputy Weatherill then took physical possession of Plaintiff's cellular phone and spoke directly to the VCL dispatcher.

21. During this direct interaction, Plaintiff explicitly stated to Defendant Deputy Weatherill and present medical staff that they were already inside the building for a 1:00 p.m. appointment with their medical doctor, and they were experiencing a severe, cascading medical crisis that had been actively worsening for the past three consecutive weeks. Defendant Deputy Weatherill's direct engagement with the federal crisis line establishes that he possessed immediate, actual knowledge that Plaintiff was in a profound state of psychiatric vulnerability and medical emergency prior to executing the subsequent misconduct.

22. Defendant Deputy Weatherill communicated with TCSO through his walkie talkie and told Plaintiff the trespassing charges have been dropped, then went inside the ER and sought out hospital staff.

23. Due to anemia, low calcium, and an escalating, trauma-induced medical psychosis, Plaintiff experienced an involuntary, cascading physical collapse, losing neurological control and falling violently directly down to the ground at the feet of Defendant Deputy Jesse Weatherill. Upon falling, Plaintiff's face was positioned directly adjacent to the deputy's pelvic region and genitalia. While trapped in this helpless, incapacitated state, Plaintiff explicitly blurted out to both responding Teller County deputies, "My dad molested me," indicating she was actively reliving vivid, involuntary flashbacks to real, documented history of childhood sexual abuse and Military Sexual Trauma (MST). Plaintiff maintains

with absolute certainty that this physical posture was entirely involuntary, a direct result of severe physical and medical incapacitation, and that she possessed zero intent or awareness to engage the deputy in any sexual manner.

24. While Plaintiff was trapped in this helpless, incapacitated state, Defendant Deputy Jesse Weatherill explicitly and severely sexually objectified, degraded, and exploited Plaintiff under color of law. Rather than rendering immediate medical aid or maintaining professional distance, Deputy Weatherill aggressively scanned Plaintiff's buttocks and body, and subsequently stared downward directly at Plaintiff's face and pelvic area with his tongue partially out of his mouth, executing explicit physical movements imitating oral sex.

25. Defendant Deputy Weatherill further positioned his head directly over Plaintiff's vagina under the fraudulent pretext of listening to a cellular phone in Plaintiff's hand, executing a severe, continuous violation of Plaintiff's constitutional right to bodily integrity and personal privacy while acting as an officer of the law. Defendant ER Charge Nurse Katie visibly watched this entire encounter from immediate proximity and completely failed to intervene.

**Delusional Exploitation and Threats of Violence**

26. In a state of active medical psychosis and trauma-induced flashback, Plaintiff made delusional statements regarding Deputy Weatherill. Rather than recognizing this as a profound medical emergency, Deputy Weatherill chose to treat these statements as personal grievances.

27. Deputy Weatherill became visibly highly emotionally unstable, acting as though Plaintiff had genuinely "cheated" on him, a factual impossibility, as Plaintiff explicitly stated on camera moments prior that they did not know who Deputy Weatherill was, and had no recollection of interacting with the Defendant Deputy when he responded to a call for service one year prior.

28. Driven by this personal grievance, Deputy Weatherill aggressively charged at his own partner to fight him, and subsequently charged directly at the incapacitated Plaintiff while pumping his fist in an imminent threat of physical battery. Deputy Weatherill's partner had to physically run alongside him, yelling, "Don't do it man, it's not worth it, don't do it!"

29. Immediately following this confrontation, while transitioning out of the acute psychiatric shock episode at the ER entrance and remaining in a severely disoriented, unmedicated state of active medical psychosis, Plaintiff uttered completely fabricated, erratic, and symptom-induced delusional statements regarding illicit substance use, claiming that Plaintiff was "on drugs and drunk right now" and stating Plaintiff knew that illegal narcotics were crossing the international border. Plaintiff maintains with absolute certainty that these remarks were entirely a manifestation of severe organic psychosis; because Plaintiff does

not consume drugs or alcohol, no individual present could have or did detect the odor of alcohol on Plaintiff's person.

30. Exploiting this visible medical and psychiatric vulnerability, Defendant Deputy Weatherill intentionally activated the recording equipment on his tactical police vest to formally initiate a criminal narcotics investigation, treating the symptom-induced, non-factual remarks of an incapacitated patient as a credible, reasonable basis for law enforcement intervention.

**The Phone Seizure, HIPAA Violation, and Actual Knowledge of Cancer Screening**

31. While transitioning out of this acute psychiatric shock episode at the ER entrance, Plaintiff was in a state of profound cognitive confusion, repeatedly stating out loud, "I can't find what I'm looking for" while having obvious neurological issues and falling over while grabbing their head.

32. Through subsequent interactions, it was determined that Plaintiff was desperately attempting to view the critical, urgent diagnostic blood work orders previously requested by their primary care physician. Due to severe cognitive impairment and trauma-induced neurological distress, Plaintiff was entirely unable to recall or input the password to access the UCHealth online patient portal on their cellular phone.

33. In an explicit plea for assistance, Plaintiff handed their physical cellular device directly to Defendant ER Nurse Jane Doe. Defendant Nurse Jane Doe took possession of Plaintiff's phone, walked inside the secure area of the medical facility, and successfully bypassed or obtained access to Plaintiff's confidential electronic medical record and active diagnostic lab orders.

34. Defendant ER Nurse Jane Doe then walked back outside to the exterior entrance where law enforcement and staff were gathered. In a flagrant violation of HIPAA and standard medical privacy protocols, Defendant Nurse Jane Doe began aggressively reading Plaintiff's private, confidential diagnostic blood work numbers out loud in the immediate presence of third-party law enforcement deputies.

35. While reading the files aloud under color of law, Defendant Nurse Jane Doe abruptly stopped speaking and exhibited visible, severe shock and panic upon reading an explicit clinical directive in the file revealing that Plaintiff's physician was urgently testing Plaintiff for potential cancer.

36. Defendant Nurse Jane Doe immediately turned and displayed the physical cellular screen to Defendant ER Charge Nurse Katie. Upon reviewing the electronic documentation of Plaintiff's potential cancer crisis and organic illness, Defendant Charge Nurse Katie similarly displayed immediate discomfort and visible panic.

37. Despite acquiring immediate, unassailable, and actual knowledge that Plaintiff was suffering from a profound organic medical crisis rather than illicit chemical intoxication, both Defendant Nurse Jane Doe and Defendant Charge Nurse Katie chose to remain entirely silent. Both nurses intentionally failed to disclose to the responding TCSO deputies that they were actively aware Plaintiff's treating physician was forcing urgent oncological and hematological testing.

38. Plaintiff explicitly demanded a final time to be permitted entry into the emergency department, demanding that staff locate and bring out a patient advocate or contact their physician directly.

39. In response, both Defendant ER nurses and the present TCSO deputies actively doubled down on their unlawful exclusion, explicitly telling Plaintiff "no" and physically barring the doorway.

40. To facilitate immediate removal and clear the property, Defendants explicitly instructed the incapacitated Plaintiff that they could return to the facility "anytime they wanted the next day," with both Defendant Nurse Jane Doe and Charge Nurse Katie affirmatively promising that they would personally ensure they were on shift to facilitate the blood draw on June 29, 2023. This deceptive directive was executed despite Defendants maintaining a stated, unverified belief that Plaintiff was actively criminally trespassing and too chemically intoxicated to remain on the property.

**Escalation to Lethal Force Against an Unarmed Patient**

41. At a subsequent point during the encounter, while Plaintiff remained severely disoriented, mentally impaired, and actively excluded from the medical facility, Plaintiff experienced sudden, sharp, stabbing pains throughout their abdomen.

42. In direct response to this acute physical distress, Plaintiff groaned loudly, instinctively grabbed their stomach, and bent forward, exhibiting clear, unmistakable visual signs of severe physiological suffering.

43. Immediately upon grabbing their abdomen, Plaintiff heard the distinct, metallic mechanical sound of two service firearms being drawn simultaneously from their respective law enforcement holsters. Based on the immediate proximity and the audio-tactile reality of the encounter, Plaintiff logically infers that the responding Teller County Sheriff's Office (TCSO) deputies drew their lethal firearms directly upon Plaintiff.

44. At all times during this encounter, Plaintiff was wearing form-fitting clothing that adhered tightly to their body. There were absolutely no bulges, indicators, or visual signs that could lead a reasonable officer to believe Plaintiff possessed a weapon, nor did Plaintiff make any gestures resembling a reach for a weapon.

45. Despite the objective reality that Plaintiff was an unarmed, disabled individual experiencing an escalating, visible medical and psychiatric crisis, the responding TCSO deputies chose to treat a physical manifestation of pain as an imminent criminal threat. By escalating a medical plea for help into a lethal force confrontation, the deputies intentionally subjected a vulnerable, incapacitated patient to unconstitutional physical intimidation and an unreasonable, terrifying seizure of their person.

46. Both Defendant ER nurses both Defendant security guards stood by, witnessed this physical firearms intimidation, physical battery threats, and sexual degradation by law enforcement, and failed to intervene or render medical aid.

**Involuntary Forced Driving and Fabricated Search Warrants**

47. Operating under their unverified assumption of acute chemical intoxication, UC Health medical personnel and TCSO deputies intentionally ordered the incapacitated Plaintiff to leave the hospital premises.

48. Defendants actively forced and compelled Plaintiff to get behind the wheel of a motor vehicle and drive away from the facility. Defendants engaged in this highly dangerous conduct with deliberate indifference, despite their own stated belief that Plaintiff was severely under the influence of illicit substances, and despite possessing actual knowledge that Plaintiff lived a significant distance—approximately 25 minutes—away through perilous mountain canyon roads.

49. On the following day, June 29, 2023, Plaintiff was permitted to return to the UC Health medical facility under the deceptive pretext of routine, standard medical diagnostic bloodwork to check for low calcium, anemia, and cancer screenings.

50. Upon arrival, hospital staff completely bypassed standard clinical protocols. Instead of processing Plaintiff through the public front-desk lab station, Defendant ER Charge Nurse Katie intentionally routed the disoriented Plaintiff into a private, secure administrative room located behind the lab check-in desk.

51. In this secure back room, the exact same hostile Defendant ER nurses who had unlawfully denied Plaintiff emergency care and abandoned them the day prior subjected Plaintiff to heightened, non-standard security demands, forcing Plaintiff to state whether they were pregnant, display physical identification, and execute physical signatures on unknown administrative documents while in a state of profound cognitive confusion.

52. During this isolation window, the drawing Defendant ER nurse repeatedly and actively turned her head to look over to her left, executing deliberate, non-verbal visual signaling and silent communication with an unseen third party positioned in an adjacent room.

53. Once this identity and document verification process was completed, Plaintiff was escorted out of the back room and further into the actual, secure blood draw room. The highly invasive physical extraction of Plaintiff's blood was not executed by standard hospital nursing staff, but by an unknown female technician or law enforcement agent who entered the room to execute an involuntary, non-consensual bodily seizure.

54. During the physical extraction, Defendant ER Nurse Jane Doe and Defendant Charge Nurse Katie stood inside the room, acting as formal witnesses to the forced procedure while Plaintiff's left hand turned visibly blue from physical distress, yet failed to initiate medical intervention.

55. Simultaneously, an unidentified man—whom Plaintiff reasonably believes to be an undercover law enforcement officer or federal task force agent—stood positioned immediately outside the room, maintaining a direct, unobstructed line of sight through the open doorway to watch and observe that the blood draw was coming directly from Plaintiff's arm to satisfy a strict law enforcement chain-of-custody protocol. Both the nurses and the outside observer watched the extraction in lockstep.

56. Upon information and belief, TCSO personnel, UC Health medical staff, and cross-jurisdictional task forces utilized this staged, deceptive healthcare facade to execute a covertly obtained search warrant to seize a sample of Plaintiff's blood without Plaintiff's knowledge or informed consent.

57. The subsequent laboratory results of this involuntary blood draw revealed a completely clean toxicology profile, confirming zero illegal substances, zero alcohol, and absolutely nothing illicit in Plaintiff's system, scientifically proving Plaintiff was experiencing a profound, unmedicated medical crisis rather than chemical intoxication.

58. Despite absolute scientific proof of innocence, Defendants continued an active criminal investigation, utilizing the threat of criminal charges to harass a disabled veteran and shield themselves from civil liability for forcing an incapacitated patient to drive a motor vehicle while medically impaired.

**Pretextual Phone Verification and Illegal Electronic Surveillance**

59. Upon being escorted out of the involuntary lab draw on June 29, 2023, at approximately 8:35 a.m., Defendant ER Charge Nurse Katie requested and documented Plaintiff's private cellular phone number under the pretext of clinical continuity, stating she would "call Plaintiff later this afternoon."

60. At approximately 3:30 p.m. that same day, Defendant ER Charge Nurse Katie placed a recorded telephone call to Plaintiff. During this call, Charge Nurse Katie explicitly admitted that the Defendant Ryan hospital security guard acted

unlawfully and "never should have interrogated Plaintiff regarding the service animal a second time at 3:10 p.m. on June 28."

61. Plaintiff reasonably believes that law enforcement and hospital defendants were utilizing the ER medical staff as proxy agents and witnesses to build a manufactured criminal file. The true structural purpose of this 3:30 p.m. call was an intentional location and identification verification maneuver to allow TCSO and an unknown amount of law enforcement to actively wiretap, monitor, and electronically surveil Plaintiff's cellular communications under a false, xenophobic criminal theory that Plaintiff's medical crisis was tied to illegal international drug cartels operating near sanctuary cities.

**Intentional Concealment and Database Manipulation**

62. On June 28, 2023, Plaintiff was told any purported criminal trespassing charges were dropped. Yet, on June 29, 2023, at 8:37 a.m.—the exact minute Plaintiff was released from the involuntary blood draw—TCSO personnel retroactively generated a police report regarding the previous day's events.

63. The institutional violation of the Americans with Disabilities Act (ADA) is explicitly admitted on the face of the June 29, 2023 police report, noting that Plaintiff was denied entry and subsequently trespassed because Plaintiff "failed to tell hospital administrators what Plaintiff needed the service dog for," asserting this was strict hospital policy. By conditioning emergency medical access on an illegal demand for private medical descriptions, UC Health and responding TCSO personnel actively enforced an unlawful policy that directly discriminates against disabled individuals under Title III of the ADA.

64. On the exact day this blood warrant was executed, June 29, 2023, Defendant Sheriff Jason Mikesell published an official multimedia broadcast on the TCSO public YouTube channel reminding the community of his direct partnership with Immigration and Customs Enforcement (ICE) and his active legal battles to maintain the 287(g) jail enforcement program, promising aggressive public community updates detailing the specific criminal elements law enforcement was seeing in the county.

65. Following this specific broadcast, the promised updates ceased entirely because Plaintiff revealed during a recorded call to the Veteran's Crisis Line on July 3, 2023, her complete innocence and severe amnesia of the psychosis episode on June 28, 2023, while threatening a lawsuit. This allowed TCSO and overlapping federal task forces to systematically cover up, misclassify, and judicially seal their criminal investigation into the Plaintiff.

66. Following the June 28, 2023 incident and the subsequent recorded July 3, 2023 VCL call which lasted approximately one hour, Defendant Jason Mikesell and TCSO personnel systematically weaponized and exploited the details of Plaintiff's severe psychiatric and medical trauma for public and political purposes.

67. During Defendant Sheriff Mikesell's subsequent political campaign for Governor of Colorado, Mikesell explicitly utilized the narrative of Plaintiff's severe medical crisis, trauma, and interactions with law enforcement to add platform leverage to publicly discuss mental health, housing, rape, and sexual assault against women and children, as well as crime trends in the state of Colorado.

68. TCSO produced, published, and maintained public multimedia content on YouTube detailing and describing the specific sequence of the June 28, 2023 incident, along with the Plaintiff's veterans crisis line phone call on July 3, 2023. While these videos purposely omitted Plaintiff's legal name, they explicitly detailed the unique, non-public operational facts of the event. This public dissemination occurred while Defendants simultaneously and falsely asserted to Plaintiff that no official records, dispatch logs, or criminal investigation files existed regarding the incident.

**Real-Time Evidence of Unbroken Legal Disability and Physical Incapacity**

69. On July 3, 2023, while continuing to deal with the immediate aftermath of the medical crisis, Plaintiff contacted the VCL and explicitly threatened a lawsuit. Following the recorded threat, TCSO and UC Health systematically failed to maintain Computer-Aided Dispatch (CAD) logs and ER documentation concerning the June 28 criminal investigation, executing an intentional spoliation of electronic evidence.

70. In a desperate attempt to locate a diagnosis for their rapidly deteriorating physical and neurological state, Plaintiff explicitly messaged their physician's clinic on July 10, 2023, stating: "Can the doctor please order tests to see if I'm dealing with an active infection such as toxoplasmosis, encephalitis, EBV, or anything that can explain some of the symptoms I've been experiencing these past 5 weeks? Symptoms include falling over, falling down, balance problems, involuntary muscle movements and spasms, facial tics, blurred and double vision, migraines, neck pain and stiffness, left side of my body is very weak with numbness and tingling throughout, difficulty with speech, memory impairment, insomnia, pressure behind my eyes, drenched in sweat, shaking and tremors, severe pacing and panic attacks unlike anything I've ever experienced."

71. Plaintiff's severe psychiatric fracturing completely decimated her functional capacity to manage daily life affairs, maintain shelter, or execute a civil lawsuit within the standard statutory period. The objective, verifiable timeline of this continuous legal disability is established by the following actions:

- **Academic Failure (Summer/Fall 2023):** Immediately following the June 28, 2023 incident, Plaintiff suffered total academic collapse, failing all university courses due to profound trauma-induced amnesia and psychiatric shock.

- **Inpatient Institutionalization (Nov 2023 – Jan 2024):** Plaintiff was entirely removed from society and placed inside an intensive inpatient residential trauma program in Arizona.

- **Documented Clinical Impairment (Jan 2024):** Upon discharge, UCHealth primary care provider for the Plaintiff explicitly recorded that Plaintiff was in "acute distress," suffering from "severe memory impairment," experiencing "personality changes" and volatile "rage," and also dealing with homelessness.

- **Severe MST Trigger and Program Flight (April 2024):** In a desperate attempt to stabilize, Plaintiff entered a second intensive residential trauma program. However, the facility failed to accommodate Plaintiff's documented Military Sexual Trauma (MST) and attempted to force Plaintiff to treat with a male practitioner. This massive psychological trigger resulted in severe autonomic failure and explosive panic-rage. Plaintiff was rendered completely unable to remain in the environment and fled the program after only five days, further derailing Plaintiff's cognitive stabilization.

- **Absolute Homelessness & Lease Dissolution (Summer 2024):** Plaintiff became completely unsheltered again, living out of their vehicle. Plaintiff was forced to utilize federal Homeless Veterans Assistance and invoke a formal physician-signed disability accommodation letter to legally break their residential lease due to dangerously exacerbated psychiatric symptoms.

- **VA Vocational Disability Designation:** Plaintiff's disability severity is recognized by the VA under the Chapter 31 Veteran Readiness and Employment (VR&E) program, which granted a strict "workload tolerance" accommodation designating part-time activity as full-time due to her severe trauma.

- **Direct CBI Records Request (December 2025):** Exercising maximum diligence to pierce through her amnesia, Plaintiff requested a criminal history records review from the Colorado Bureau of Investigation (CBI), which returned zero records, proving the subterranean nature of TCSO's hidden tracking.

- **Triggered Psychotic State (June 2025 – Present):** Upon relocating to a rental in Florissant, Colorado, Plaintiff discovered that Defendant Sheriff Mikesell and TCSO personnel had weaponized their private medical crisis for political gain and published localized operational facts on public multimedia channels. Plaintiff also has to drive past TCSO and UC Health just to go to the grocery store. This discovery immediately triggered severe post-traumatic dissociation, continuous panic attacks, and active psychotic symptoms, rendering Plaintiff mentally incapable of filing a lawsuit until now.

- **Notarized Witness Verification:** Plaintiff's severe cognitive fracturing, total loss of daily functioning, and profound mental incapacitation throughout the statutory period are independently verified by three (3) distinct, notarized third-party witness statements.

72. In March 2025, as Plaintiff's trauma-induced amnesia began to fracture following a physical seizure, Plaintiff initiated direct electronic contact with TCSO

Lieutenant Bunting. Plaintiff explicitly disclosed that her memory of the incident involving Defendant Deputy Weatherill was actively returning, stated deep remorse for their uncontrollable behavior during the medical crisis. Defendant Sheriff Mikesell and Lt Bunting responded on a public broadcast stating *"we know you guys have a lot going on in your lives, we care"* which Plaintiff believes was a direct response to that email inquiry.

73. In May 2025, Plaintiff emailed Lieutenant Bunting a second time, directly questioning why Plaintiff was actively denied access to emergency mental and physical health stabilization by responding personnel. Plaintiff explicitly requested the official TCSO protocol for initiating medical and mental health interventions and directly stating: *"I know you guys criminally investigated me."*

74. Immediately following this May 2025 email exchange, Plaintiff exercised maximum diligence and formally requested official records from the Teller County Sheriff's Office for the first time. In response to this official request, TCSO records technicians issued a formal written declaration stating that no criminal investigation took place, and no records exist regarding the incident, asserting the event was logged merely as a standard "trespass warning".

75. In direct response to Plaintiff's escalating inquiries, Defendant Sheriff Jason Mikesell, Lieutenant Bunting, and Deputy Thomas Allen published a targeted public multimedia broadcast on the official TCSO channels in May/June 2025, explicitly looking at the camera and stating, *"We're friends, you can talk to us."* This highly specific messaging directly mirrored—and effectively mocked—Plaintiff's highly confidential disclosures made to federal crisis line dispatchers during the July 3, 2023 Veterans Crisis Line call, where Plaintiff had wept and stated: *"TCSO are the only resources I have here to reach out for help, they're not my friends, they're not going to help me."* This sequence provides undeniable circumstantial proof that Defendants maintained actual knowledge of Plaintiff's innocence, intercepted their privileged crisis communications, and weaponized public platforms to gaslight an incapacitated veteran to shield themselves from liability.

76. In October 2025, Plaintiff experienced a severe medical emergency and contacted a federal VA nurse hotline. Due to the severe trauma remaining from the 2023 incident, Plaintiff explicitly stated to the nurse that TCSO better not present at their home. Bypassing this safety request, dispatch patched a TCSO unit onto the line, causing a real-time, recorded manifestation of autonomic nervous system failure and severe psychological distress. Because an ambulance and fire department ultimately arrived, official Computer-Aided Dispatch (CAD) logs were generated, creating an un-erasable data trail of ongoing emotional damages.

77. Legacy Nepotism and Lateral Transfer: Plaintiff discovered direct evidence of institutional nepotism and an explicit motive for the ongoing record concealment via an official January 2026 public broadcast by the neighboring Douglas County

Sheriff's Office. The broadcast confirms that Defendant Deputy Jesse Weatherill's father was a long-time legacy law enforcement officer who previously worked directly alongside command staff within the Teller County Sheriff's Office. In January 2026, amidst Plaintiff's escalating records inquiries, TCSO facilitated a lateral transfer of Defendant Deputy Weatherill to the Douglas County Sheriff's Office. Plaintiff holds a firm, reasonable belief that TCSO personnel systematically manipulated public tracking databases and falsely declared that "no records exist" to shield a legacy officer's son from civil liability, federal civil rights exposure, and structural career damage.

78. The campaign to weaponize hidden file details and gaslight Plaintiff extended directly into Plaintiff's private residence. In March 2026, Plaintiff contacted TCSO dispatch to report an unrelated issue regarding a neighbor's off-leash dogs, explicitly instructing dispatchers to have personnel phone Plaintiff rather than sending a physical unit to Plaintiff's home. Bypassing this request, Defendant Deputy Santiago Marquez—the exact deputy who unlawfully executed the 2023 UC Health trespassing exclusion—personally presented at Plaintiff's private residence. Upon arrival, Deputy Marquez explicitly denied possessing any personal recognition of Plaintiff, but immediately proceeded to blurt out highly specific, non-public operational details regarding the June 28, 2023 incident, asserting that Plaintiff "deserved to be trespassed for Plaintiff's actions." While TCSO had previously released a basic trespassing record to Plaintiff, the department continuously maintained in official writing that no further records or investigations existed. Plaintiff holds a firm, reasonable belief that Defendants actively manipulated their database tracking to intentionally hide the official records of their intensive criminal investigation to shield themselves from liability. When Plaintiff, in a fit of trauma-induced rage at this obstruction, cussed out the deputy and stated, "You guys criminally investigated me and wiretapped my phone," Deputy Marquez actively lied to Plaintiff's face, mockingly responding, "You really believe that?", attempting to gaslight Plaintiff into believing Plaintiff's knowledge of the subterranean criminal investigation was entirely delusional. This interaction, which Plaintiff securely captured via video recording, serves as direct evidence of ongoing fraudulent concealment and bad-faith manipulation by a primary named Defendant.

79. Further demonstrating continuous mental incapacitation and unbroken legal disability, Plaintiff attempted to reach out to an acquaintance within the local community via Facebook Messenger to disclose the events of the June 28, 2023 incident, explain the misconduct executed by UCHealth and TCSO, and plead for assistance in filing a civil lawsuit. Plaintiff explicitly communicated during this exchange an absolute inability to mentally or physically write down the traumatic sequence of events due to experiencing profound neurological disorientation and volatile, trauma-induced rage whenever attempting to recount the details. Due to severe post-traumatic psychological triggers and acute avoidance symptoms, Plaintiff subsequently deleted the electronic Facebook Messenger conversation. Because the community acquaintance tragically and unexpectedly passed away

thereafter in a motor vehicle accident, the message logs cannot be retrieved, rendering this corroborating evidence completely unavailable due to circumstances entirely beyond Plaintiff's control. This severe psychological fracturing and documentation of extreme cognitive avoidance serves as direct proof of Plaintiff's continuous mental incapacity and structural inability to execute a federal civil lawsuit within the standard statutory period.

80. Plaintiff is actively facing an escalation of this legal disability and trauma, as Plaintiff received a no-fault eviction notice and is actively facing complete homelessness starting in December 2026.

81. Certified Proof of Absent Court Records: In October 2026, Plaintiff executed an exhaustive search of local court databases to locate any hidden criminal files or sealed records related to the June 2023 incident. The 4th Judicial District Court officially issued a certified, legal "Statement of No Records Found" to the Plaintiff. This certified document serves as unassailable physical evidence that the Teller County Sheriff's Office intentionally withheld and hid their intensive criminal tracking files from public and judicial tracking systems to insulate themselves from civil liability.

82. Ongoing Diligence Amid Exhaustive Archive Backlogs: To exhaust every possible avenue of discovery prior to filing, Plaintiff formally submitted urgent records requests to the Teller County Court in Cripple Creek and the United States District Court for the District of Colorado in Denver. Both judicial record repositories formally notified Plaintiff that they are severely backlogged, rendering any potential records inaccessible for at least two weeks. Because any further delay severely risks Plaintiff's physical safety and timely access to the courts, Plaintiff is filing this action using the maximum information available, relying on federal discovery tools to force the production of the suppressed files.

83. Because Defendants actively concealed the official public records of the incident, and because Plaintiff was officially assured by law enforcement technicians in writing and on video that "no records exist," the statute of limitations must be equitably tolled under the doctrine of fraudulent concealment. Defendants cannot profit from their own active database deception, and Plaintiff is entitled to the tools of federal discovery to unseal the suppressed judicial records.

**Timeliness, Delayed Accrual, and Equitable Tolling**

**Delayed Accrual under the Discovery Rule:** Under federal law, a § 1983 claim does not accrue until the plaintiff knows or has reason to know of the injury and its cause (*Alexander v. Oklahoma*, 382 F.3d 1206, 1215 (10th Cir. 2004)). Following the extreme trauma of the June 28, 2023 incident, Plaintiff suffered from severe, trauma-induced amnesia and profound neurological disorientation. This complete lack of cognitive awareness and memory of the event is objectively preserved in a recorded, hour-long federal Veterans Crisis Line (VCL) call on July 3, 2023, during which Plaintiff explicitly disclosed to federal dispatchers a total lack of memory regarding the psychosis episode and severe confusion regarding the medical crisis. Because Plaintiff lacked the factual data of what occurred, and because Defendants actively concealed their covert blood seizure, wire tapping, and subterranean criminal files, Plaintiff did not discover—nor

could a reasonable person exercising due diligence discover—the true nature and constitutional causes of their injuries within the standard statutory period. This timeline is further extended under Tenth Circuit standards because state actors actively hid names, files, and investigation records to escape liability (*Garrett v. Fleming*, 362 F.3d 692 (10th Cir. 2004)).

**Equitable Tolling for Mental Incapacity:** Plaintiff is entitled to equitable tolling of the statute of limitations under Tenth Circuit standards because severe, continuous cognitive and psychiatric trauma rendered Plaintiff functionally unable to manage daily life affairs or execute a civil lawsuit (*Reupert v. Workman*, 45 F. App'x 852, 854 (10th Cir. 2002); *Biester v. Midwest Health Servs.*, 77 F.3d 1264, 1268 (10th Cir. 1996)). This legal disability is characterized by severe autonomic nervous system failure and trauma-induced dissociation, and is verified by objective medical records. Specifically, the July 3, 2023 VCL recording establishes that Plaintiff was actively experiencing a blending of traumatic memories and organic medical symptoms—including a severe oncological crisis—leaving Plaintiff entirely incapacitated. Federal law allows tolling when the very incompetence and trauma causing the delay was directly aggravated by the injuries the defendants inflicted (*Lake v. Arnold*, 232 F.3d 360, 371 (3d Cir. 2000)). This continuous incapacity is further documented by third-party sworn affidavits confirming Plaintiff lacked the required functional cognitive capacity to access the courts during the statutory window.

**Equitable Tolling for Fraudulent Concealment and Estoppel:** Defendants are equitably estopped from asserting a statute of limitations defense because they affirmatively misled Plaintiff, wrongfully obstructing the ability to bring these claims (*Dean Witter Reynolds, Inc. v. Hartman*, 911 P.2d 1094, 1099 (Colo. 1996)). Upon information and belief, during the July 3, 2023 VCL call, law enforcement defendants intercepted Plaintiff's disclosures, acquired direct knowledge of Plaintiff's amnesia, and intentionally utilized this information to cover up and misclassify their intensive criminal investigation. When Plaintiff later attempted to exercise due diligence—including a specific inquiry to TCSO records technicians in May 2025 and recently again in October 2026 regarding the intensive criminal files—technicians explicitly and falsely assured Plaintiff that no such records or investigations existed, listing the event merely as a "warning" and hiding the official files from public tracking databases to shield themselves from liability.

## II. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of the Fourteenth Amendment — Substantive Due Process (Bodily Integrity) via 42 U.S.C. § 1983**

*(Against Defendant Deputy Jesse Weatherill, in his individual capacity)*

84. Plaintiff realleges and incorporates by reference all allegations contained in this Complaint.
85. Defendant Deputy Jesse Weatherill, while acting under color of law, intentionally, maliciously, and egregiously sexually objectified, degraded, and harassed Plaintiff while Plaintiff was completely incapacitated, disoriented, and experiencing an active, visible medical emergency. By executing explicit gestures mimicking oral sex over Plaintiff's collapsed body, staring at Plaintiff's pelvic region, and placing his head directly over Plaintiff's genitalia under a fraudulent

pretext, Defendant's conduct severely shocks the conscience and constitutes an intentional deprivation of Plaintiff's fundamental constitutional right to bodily integrity under the Fourteenth Amendment.

**SECOND CAUSE OF ACTION**
**Violation of the Fourteenth Amendment — Substantive Due Process (State-Created Danger) via 42 U.S.C. § 1983**
*(Against Defendant Deputy Jesse Weatherill and Defendant TCSO Personnel, in their individual capacities)*

86. Plaintiff realleges and incorporates by reference all allegations contained in this Complaint.

87. Defendants, while acting under color of law, affirmatively created a life-threatening, extra-hazardous danger that would not have otherwise existed. Operating under an unverified, subjective assumption that Plaintiff was severely chemically intoxicated, Defendants intentionally refused emergency medical stabilization, physically barred Plaintiff from hospital entry, and actively ordered and forced the medically psychotic, physically failing Plaintiff to operate a motor vehicle and drive a significant distance away. Defendants engaged in this conduct with deliberate indifference to a known, catastrophic safety risk, directly causing severe psychological and physical injury.

**THIRD CAUSE OF ACTION**
**Violation of the Fourteenth Amendment — Right to Privacy via 42 U.S.C. § 1983**
*(Against Sheriff Jason Mikesell, in his individual and official capacity)*

88. Plaintiff realleges and incorporates by reference all allegations contained in this Complaint.

89. Under the Fourteenth Amendment, citizens possess a protected, fundamental liberty interest in avoiding the unauthorized public disclosure of their personal, highly sensitive medical and psychiatric history. Defendant Sheriff Jason Mikesell and TCSO personnel unlawfully coordinated a deceptive location-verification phone call using hospital nurses as proxy investigators, deploying illegal electronic monitoring and wiretaps against Plaintiff based on an unsubstantiated cartel narrative. Defendant further intercepted and publicly weaponized Plaintiff's confidential medical communication details from a federal Veterans Crisis Line call for personal political leverage and campaign purposes, serving no legitimate law enforcement or governmental purpose and constituting an intentional invasion of constitutional privacy.

**FOURTH CAUSE OF ACTION**
**Violation of the Fourth Amendment — Unreasonable Seizure & Excessive Force via 42 U.S.C. § 1983**
*(Against Deputy Jesse Weatherill and Defendant TCSO Personnel, in their individual capacities)*

90. Plaintiff realleges and incorporates by reference all allegations contained in this Complaint.

91. Defendants subjected Plaintiff to an unreasonable, terrifying seizure and excessive force under color of law. When Plaintiff instinctively gripped their abdomen in sudden, intense physical pain from an organic crisis, Defendants drew their lethal firearms directly upon the unarmed, non-threatening Plaintiff. Because Plaintiff was in form-fitting clothing with zero physical signs of a weapon, the brandishing of lethal firearms against a medically incapacitated patient was objectively unreasonable.

92. Defendants further executed an unconstitutional search and seizure by obtaining a fraudulent blood search warrant under entirely false, pretextual pretenses. Defendants deliberately omitted Plaintiff's visible, screaming medical emergency from the judicial affidavit, voiding the warrant under *Franks v. Delaware*. To execute this covert seizure, UC Health personnel actively conspired as an arm of law enforcement by bypassing the public lobby check-in, tactically isolating the disoriented Plaintiff in a secure back administrative room, and utilizing silent visual signaling to hidden TCSO units in adjacent rooms to execute a staged healthcare facade under absolute fraud and duress to shield themselves from civil liability.

**FIFTH CAUSE OF ACTION**
**Violation of Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12181**
*(Against Defendant UC Health Pikes Peak Regional Hospital, and Defendants Ryan Doe Security Guard, Jane Doe Security Guard, ER Charge Nurse Katie, and ER Nurse Jane Doe, in their individual and operational capacities)*

93. Plaintiff realleges and incorporates by reference all allegations contained in this Complaint.

94. Defendant UC Health is an entity operating a place of public accommodation under Title III of the ADA. Defendant intentionally discriminated against Plaintiff based on disability by conditioning emergency medical access upon an invasive, non-compliant, and illegal interrogation regarding Plaintiff's task-trained service dog. Defendant's personnel willfully overrode compliant staff verifications, issued an unlawful criminal trespassing exclusion, and physically barred Plaintiff from entering the facility to receive critical diagnostic monitoring, directly causing a catastrophic physical and mental breakdown.

**SIXTH CAUSE OF ACTION**
**Violation of the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd** *(Against Defendant UC Health Pikes Peak Regional Hospital, and Defendants ER Charge Nurse Katie and ER Nurse Jane Doe, in their individual and operational capacities)*

95. Plaintiff realleges and incorporates by reference all allegations contained in this Complaint.

96. Defendant UC Health is a participating hospital operating an emergency department under federal law. On June 28, 2023, Plaintiff presented to

Defendant's emergency facility in an acute, visible, and profound physical and psychiatric emergency. Defendant's staff acquired direct, actual knowledge of Plaintiff's emergency state, including the explicit vocal reading of Dr. Yacoub's urgent cancer evaluation screening files. Despite this actual knowledge, Defendant entirely failed to provide a mandatory emergency medical screening examination or necessary stabilizing treatment. Instead, Defendant chose to criminalize, trespass, and physically ban the vulnerable patient from the premises, actively abandoning Plaintiff to a hostile police intervention and forced impaired driving.

**SEVENTH CAUSE OF ACTION**
**Civil Conspiracy to Deprive Constitutional Rights via 42 U.S.C. § 1983**
*(Against All Defendants: Teller County Board of County Commissioners, Sheriff Jason Mikesell, Deputy Jesse Weatherill, Deputy Kyle Perkins, Deputy Santiago Marquez, UC Health Pikes Peak Regional Hospital, ER Charge Nurse Katie, ER Nurse Jane Doe, Security Guard Ryan Doe, and Security Guard Jane Doe, in their individual and official capacities)*

82. Plaintiff realleges and incorporates by reference all allegations contained in this Complaint.

83. All named Defendants reached a meeting of the minds and engaged in a continuous, coordinated conspiracy under color of law to deprive Plaintiff of constitutional and civil rights. The hospital defendants (UC Health, Nurse Katie, Nurse Jane Doe, Guard Ryan Doe, Guard Jane Doe) actively acted as an arm of law enforcement by utilizing silent visual signaling, bypassing public lobby stations, and isolating the disoriented Plaintiff in a secure back room to facilitate a staged healthcare facade for an illegal blood seizure.

84. Concurrently, the law enforcement defendants (Sheriff Mikesell, Deputy Weatherill, Deputy Perkins, Deputy Marquez) deployed electronic wiretaps, intercepted confidential crisis logs, and manipulated public tracking databases to falsely declare "no records exist" to shield themselves and a legacy officer from civil liability and cover up their joint constitutional violations, directly causing severe, ongoing physical and emotional damages.

## E. REQUEST FOR RELIEF

*State the relief you are requesting or what you want the court to do. If additional space is needed to identify the relief you are requesting, use extra paper to request relief. Please indicate that additional paper is attached and label the additional pages regarding relief as "E. REQUEST FOR RELIEF."*

Plaintiff respectfully requests that this Court enter judgment in their favor and against Defendants, granting the following relief:

- **Compensatory and Punitive Damages:** Award financial compensation for all severe physical injuries, profound emotional trauma, constitutional deprivations, and ongoing medical liabilities in an amount to be determined at trial.

- **Injunctive Relief:** Order the immediate, complete disclosure and unedited release of all computer-aided dispatch (CAD) logs, internal emails, database logging trails, wire-tapping, and law enforcement body-worn camera videos pertaining to the manufactured June 28-29, 2023 investigation.

- **Equitable Tolling:** Enter an explicit order declaring the statute of limitations equitably tolled based on the documented continuous legal disability and fraudulent concealment executed by Defendants.

- **Other Relief:** Grant any other legal or equitable relief the Court deems just and proper.

## F. PLAINTIFF'S SIGNATURE

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. See 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

[signature]
*(Plaintiff's signature)*

10/14/2026
*(Date)*

*[CONFIDENTIAL - MOTION TO PROCEED UNDER PSEUDONYM AND UNDER SEAL FILED CONCURRENTLY]*